# SUPREME JUDICIAL COURT,

### FOR THE

## EASTERN DISTRICT,

## 1856.

## COUNTY OF PENOBSCOT.

STATE OF MAINE *versus* JOEL WILSON.

A ferry is a liberty to have a boat upon a river for the carriage of men and horses for a reasonable toll. Its limits are high water mark upon either shore.

It necessarily requires such privileges as will make it effectual. Passengers may be received and landed at the margin of the water upon the shore, at all times of tide and in all states of the river.

When the space between high and low water is in part or wholly bare, passengers may pass over the shore without hindrance, and without liability for damages to the riparian proprietor.

A reservation in a deed sometimes has the force of an exception, and these terms are frequently used indiscriminately. A saving or exception is always a part of the thing granted and in being; a reservation is of a thing not in being, but is newly created out of lands and tenements devised.

When land is granted, and a right of way *reserved*, that right of way becomes, in a legal sense, a new thing, separated from the right of the grantee in the land.

A way had been laid out, and used by the public for nearly twenty years, across the land of A., when he conveyed it to B. After the description in his deed, he used the following language:—"reserving to the public the use of the way laid across the same from the county road to the river":—

State *v.* Wilson.

*Held*, that this saving clause applied to " the way" then in existence, and should be treated as an exception.

Public ways may have a legal existence by dedication, not only to a corporate body capable of taking by grant, but also to the general public, and limited only by the wants of the community. If accepted and used in the manner intended, the owner and all claiming in his right are precluded from asserting ownership inconsistent with such use.

The right of the public in such case does not rest upon a grant by deed, nor upon twenty years' possession, but upon the *use* of the land with the *assent* of the owner, for such length of time that the public accommodation and private rights might be materially prejudiced by an interruption of the enjoyment.

To constitute a way by dedication, two things are necessary, the *act* of dedication, and the *acceptance* of it by the public.

But it does not follow, because of the dedication of a public way by the owner of the soil and the use of it by the public, that the town, or other public corporation, is bound to keep it in repair. In order to this, *it seems* that there should be proof of acquiescence or adoption by the corporation itself.

In this State, if a county, town or plantation, against which a suit is brought, or an indictment found, has, at any time within six years before the injury for which damages are sought, made repairs on the road alleged to be defective, it is not competent for such county, town or plantation to deny the location of such road.

By virtue of the proviso contained in the Colonial ordinance of 1641, persons, had a right to use the shore of the Penobscot river, including the right of mooring their vessels thereon and of discharging and taking in their cargoes.

The establishment of a ferry on that river in 1798, by the Court of Sessions, was neither an enlargement nor a restriction of that right.

The use of the shore, as a way for travel, is the exercise of a right which the owner of the shore cannot abridge or restrict. When the river is covered with ice his rights and those of the public remain unchanged. Citizens may still traverse the river at pleasure.

The use of a way by the public, the right to which is fully supplied by law, raises no presumption of dedication. The owner, by silence, assents to its use, only as in any other case where he sees citizens exercising privileges which are clearly their own.

It is a well settled principle that highways may have a legal existence from immemorial usage.

Long occupation and enjoyment of a way, unexplained, will raise a presumption of a grant, not only of the easement, but of the land itself; and not only of a grant, but of acts of legislation and matters of record.

But such presumption is predicated on the existence of some right or title which is the subject of the grant. No one is presumed to have granted to the public a right, when it is by law in the public to the fullest extent.

State *v.* Wilson.

By the change of the common law of this State from what was the common law of England, in regard to the rights of the proprietor of lands adjoining flats upon or about tide waters, it must be presumed that some benefit was designed to such owner. It has never been held that he is precluded from erecting wharves and piers on his own flats, thus preventing the passage of vessels over flats covered by such erections, provided he did not thereby materially interrupt general navigation.

By the erection of such permanent structures as he may thus lawfully place upon his own premises, he acquires no exclusive right to those portions remaining open. The public have still, in common with him, the right to use the open space, provided they do not interfere with his erections.

A public way cannot be laid out across a navigable stream, or extending further than to high water mark, except by authority from the Legislature.

A *landing*, though for the purpose of direct transit, is more than a highway. In the latter case, the owner of the soil, subject to the right of mere passage, is still absolute master.

The public have no right to use and occupy the soil of an individual adjoining navigable waters, as a public landing and place of deposit for property in its transit, against the will of the owner, although such *user* has been continued for more than twenty years.

Such *user* affords no foundation for the presumption of a grant, nor evidence of a dedication. Prescription will give no right to the exclusive occupation of another's land, for such purpose, as it may give the traveler the right to pass over it without the power of halting thereon; and any such use of it amounting to an invasion of the rights of the proprietor, would be similar to a trespass upon upland, and the remedy would be the same.

On REPORT from *Nisi Prius*, HATHAWAY, J., presiding.

This was an indictment for a nuisance. The act complained of was the erection of a wharf on the eastern shore of Penobscot river, between high and low water marks, at a place known as "Chamberlain's ferry," leading from Brewer to Bangor.

The facts are fully stated in the opinion of the Court.

After the testimony was all in, the presiding Judge suggested, that as there was no conflicting testimony, and as the issue depended entirely upon the law, the questions in regard to which were important, the case should be put in form to be presented to the law Court; and thereupon it was agreed by the County Attorney, on the part of the government, and by the respondent Wilson, that a verdict of guilty *pro forma*, should be taken, and the case sent up to the law Court on report.

If, upon examination of the testimony and the law, the Court should be of opinion that the respondent ought to be acquitted, the verdict was to be set aside and a *nolle prosequi* entered; otherwise the verdict of guilty was to stand.

In accordance with that agreement a verdict of guilty was entered, and the case continued on report.

*J. A. Peters*, for the State.

1. The *locus in quo* in this case is set out as a parcel of *shore* upon Penobscot river. The word *shore* is a technical term, meaning land between high and low water marks. 4 Hill, (N. Y.) 375; 6 Cowen, 547.

2. We contend that the *locus in quo* belonged to the public by a dedication. That Wilson's grantor dedicated it by act *en pais* and by deed.

The language of the deed under which Wilson claims, contains these words, "reserving to the public the use of the way laid across the same, from the county road to the river." This language is a clear reservation, binding upon Wilson, reserving from Wilson what the grantor had given to the public. See 36 Maine, 60, where the Court discuss the meaning and effect of these words, to wit, "the said land is to be common and unoccupied."

The doctrine of the dedication of streets has now become well settled. *Larned* v. *Larned*, 11 Metc. 423; *Call* v. *Sprowl*, 35 Maine, 161.

Dedication may be to the general public, instead of to any person or body capable of taking by grant. 10 Peters, 662; 2 Greenl. Ev. § 662.

No act of dedication need be proved, only the fact. No particular time and no particular ceremony is required to prove a dedication and assent. I refer particularly to *Call* v. *Sprowl*, 35 Maine, 170, and the cases there cited by the Court, also, *Dwinel* v. *Barnard*, 28 Maine, 564.

What time is necessary depends upon the circumstances of each case. If the act of dedication be unequivocal it may take place *instanter*. 5 Taunt. 125.

Lapse of time is among the elements to constitute a dedi-

cation, but not a basis on which it necessarily exists. *Commonwealth* v. *Fisk*, 21 Pick. 243.

Six years user has been held sufficient to presume a dedication from user. 11 East, 375.

Twelve years in case, in 2 Johns. 424.

" A considerable time," in 3 N. H. 335.

Six or seven years, in 6 Peters, 498, 513. See 2 Greenl. Ev. before cited.

If six years user is necessary in this case, we show it. If twelve, or even twenty, we show that. If unequivocal and positive acts are better evidence of the grantor's intention, than mere lapse of time, we have shown them.

3. The respondent puts in the establishment of certain record roads as a piece of evidence. We avail ourselves of them for a single purpose, and that is, to show an intention upon the part of the public to accept the grant. Otherwise we see no force in that evidence, because the controversy is now about the "shore." If roads have been made and unmade, they never extended over the "shore," inasmuch as a record road cannot be legally laid out over flats between high and low water marks, by a town or by County Commissioners. 5 Pick. 492; 1 Greenl. 112.

But an easement can be had between high and low water mark by dedication. 6 Peters, 431, 498. To same point, 10 Peters, 663; 6 Greenl. 118; 8 Pick. 504.

" Easements created by reservation or grant may be enlarged by prescription." 20 Pick. 291, 302.

It does not appear that a dedicated way can be discontinued by the county. The way is reserved to the public; the county is only a part of the public. 2 Pick. 44.

It does not follow, because an owner dedicates, and the public uses, that the town or county is bound to repair. 2 Greenl. Ev. § 662, and the numerous cases cited in a note to same in the last edition.

4. Even if the existence or non-existence of a statute road could affect this question, and there could be such on the shore, still, nineteen years have elapsed since the statute

road was discontinued, during which time there is proof of dedication and acceptance.

The respondent, and also the government, put in evidence the existence of the ferry. The fact of a ferry shows also the necessity of a road or way; a reason for its dedication by the owner and acceptance by the public. The ferry is a right upon the water; the way over the shore to the water was necessary. Here lies an objection to the obstruction of the ice on the shore, because, although the ferryman is obliged to make and keep open a sled road in the winter, this wharf has been an obstruction in the way of his so doing. R. S., c. 27, § 10, and other sections.

5. But if there was not a road by dedication, the very absence of the elements to make a dedication would make it a road by *user*. Even if the part of the road to *high water* mark was not a road by *user*, the *"shore"* must be. An easement on a *"shore"* can be acquired by user. 19 Pick. 110; 18 Pick. 312; 8 Pick. 504; 6 Greenl. 118.

It was contended at *Nisi Prius*, that an easement cannot be acquired upon an easement. Of course, an easement cannot be acquired in the way, so as to obstruct the passage of Penobscot river, but it can be acquired servient to it. But we contend, not for a right over the *water*, but over the shore to get *to the water*.

But flats are not appurtenant to the upland. 25 Maine, 51, and other cases.

There is the easement of tow paths, which has been acknowledged for a century or more. The doctrine is also acknowledged in the case of *Thornton* v. *Foss*, 26 Maine, 402.

In *French* v. *Camp & al.*, 18 Maine, 433, the Court say, "all have a lawful right to travel on a public river upon the ice, and a winter way may be acquired by twenty years user."

In the case at bar there had been a winter way for sixty years or more, and Wilson obstructed it, and this is the real grievance now complained of.

6. The legal meaning of the words "to the river," has been clearly and judicially settled. It means at least to low

water mark. The reservation must be as extensive as the land conveyed. *Bangor House* v. *Brown*, 33 Maine, 309; *Hatch* v. *Thomas*, 3 Sumner, 170. The same point is settled in similar cases in 6 Peters, 431, 498; 10 Peters, 663.

I refer particularly to the case of *Dovaston* v. *Payne*, 2 Smith's Leading Cases, and all the notes, English and American, as giving a general elucidation of the subject.

*Rowe & Bartlett*, for defendant.

1. The indictment describes the river as navigable; no highway for land travel, therefore, can exist across it, or upon its shore, but by license of the Legislature. Such a highway, without such license, could exist only by sufferance, and not by law, being liable to be indicted and abated as a nuisance at any time. *Commonwealth* v. *Charlestown*, 1 Pick. 185; *Keene* v. *Stetson*, 5 Pick. 492; *Arundel* v. *McCulloch*, 10 Mass. 70.

2. The case shows that, instead of a common and public highway across the river, there has been a legally licensed ferry at this point, for more than fifty years past. The two cannot co-exist at the same place.

Up to August, 1834, there was a highway to the river. The traveler stepped from that highway on to the ice which covered the shore, and touched the line of the highway. This travel the riparian proprietor had no right to interrupt, for the public right to the use of the water of a navigable river is not cut off by the frost, though its mode of use may be changed by it. That travel never touched the shore, but was confined to the waters of the river in a congealed state. *French* v. *Camp*, 18 Maine, 433.

3. Besides, by statute the ferryman was bound to level the ice and keep it clear, so that the public could have a passage at the ferry. R. S., c. 27, § 10.

The winter road then existed there as a part of, or adjunct to the ferry, and not by adverse *user* on the part of the public.

4. The admission that the fee is in respondent, is an admission that there was no reservation, at that point, for a

town landing.    Is any other public landing known to our law ?

Whether the existence of a public landing can be established by proof of user, is, at least, doubtful.

In *Pearsall* v. *Post*, 20 Wend. 111, where the subject was fully discussed, the Supreme Court of New .York decided that the existence of a public landing cannot be thus proved; that such *user* is neither the foundation of the presumption of a grant, nor evidence of a dedication.    And the decision in that case was affirmed by the court of errors in *Post* v. *Pearsall*, 22 Wend. 425.

5. If it can be thus established, the proof in this case is insufficient.

Besides the use of the *locus* as a ferry-way, for landing passengers and goods, the proof of user is confined to the laying an occasional raft of lumber there when the tide was out. Rafts rightfully floated there at high tide, it being navigable water, and when the lumber was taken out, it was piled not on the shore, which alone is in question here, but on the bank, which was, till August, 1834, a highway.          •

.In *Greene* v. *Chelsea*, 24 Pick. 80, where the question was like this, the Court say, " the doctrine of dedication, if it be adopted in this State, does not extend to land like the demanded premises; and if it did, would not bar this action. Dedication must originate in the voluntary donation of the owner of the land, and be completed by the acceptance of the public.    And to support a dedication, there must be such a user, and so accompanied by corroborating circumstances, as clearly to demonstrate both.    Now here does not appear to be a user sufficient to show either.    And it is unaided by any acts on the part of the owner indicative of an intent to give the use of this land, or on the part of the public to accept it.    The occasional, trifling and irregular use made of the land or flats, is altogether too imperfect an occupation to prove a dedication."

In *Bethum* v. *Turner*, 1 Greenl. 111, the same doctrine is laid down.

6. It was not a public landing on July 4, 1798, when the ferry was first established by law, for the record describes it there as " Burr's landing," and there is no evidence to rebut the inference to be drawn from that description. Ever since, it has been used as a ferry-way by the owner of the fee or those claiming under him, and could not by any usage become a public landing; for the sole control of a ferry-way is vested in the ferryman. R. S., c. 27, § § 15, 17. While at a public landing all must have equal rights.

In the case of *Deering* v. *Long Wharf,* 25 Maine, 64, 65, 66, it was decided that, under the ordinance of 1641, " so long as flats remain open and free from such erections as stop and hinder the passage of boats, &c. there is reserved for all, the right to pass freely to the lands and houses of others besides the owners of the flats; this includes the right of mooring their vessels thereon, and of discharging or taking in their cargoes." " The owner of the flats has no power to take away or restrict this right, while the space is unoccupied." " The owner then is deprived of none of his rights by this enjoyment by others, has no power to restrain them, and loses nothing of his legal title to possession by suffering that which he had not the effectual means to prevent."

TENNEY, C. J. — In the first count of the indictment, it is alleged, that at the time of committing the offence charged, there was and still is an ancient, common and public highway in the town of Brewer, commencing at a point in the county road leading from Eddington to Orrington, through the town of Brewer, near the post office in Brewer, thence running westerly to Penobscot river, and thence across said river to the city of Bangor. In the second count is described an ancient, public and common highway, existing from a time whereof the memory of man is not to the contrary, near an old ferry-way commonly called " Chamberlain's ferry," and leading from the same point in the county road, across land formerly owned by John Wilkins, down to the Penobscot river, at low water mark. And in the third count, an ancient,

common and public landing place, on the easterly bank and shore of the Penobscot river, at the old ferry-way called " Chamberlain's ferry," which ferry leads from Brewer to Bangor, is alleged to have existed from a time whereof the memory of man is not to the contrary. And the defendant is charged in the indictment with having erected upon said highway and landing place, between high and low water mark, upon the shore of said river, which is alleged to be navigable, a wharf, to the great damage and common nuisance of all the good citizens of this State, &c.

In the year 1798, a ferry was established by the Court of Sessions for the county of Hancock, from this landing, then called Burr's landing, to two points on the Bangor side of the Penobscot river, one above and the other below the mouth of the Kenduskeag stream; and one Bridge was appointed the ferryman for the term of seven years.

In the year 1802, a road was laid out and established by the Court of Sessions of the same county of Hancock, from the said county road to this ferry, then called in the records " Crane's ferry," across the land now owned by the defendant, three rods wide.

In the year 1824, a road was laid out and established, four rods wide, by the Court of Sessions for the county of Penobscot, (which county had been formed from the county of Hancock between the years 1802 and 1824, and embracing with other towns, those of Brewer and Bangor,) from high water mark, at this ferry-way on the east side of Penobscot river to the east line of Brewer, which road was discontinued by the Court of County Commissioners for the county of Penobscot in 1833, so far as it lay between the ferry and its intersection with a road laid out and established from Penobscot bridge in Brewer, and extending in an easterly direction.

On August 7, 1822, John Wilkins conveyed to the defendant, by deed of that date, four acres of land in Brewer, embracing the site of the wharf and a considerable length of shore above and below, and the land extending back from all

of said shore to, or nearly to the county road leading from Eddington to Orrington. After the description of the premises in the deed, is the following language: "reserving to the public the use of the way laid across the same from the county road to the river."

It is admitted by the counsel for the State, that the fee of the land upon which the wharf is erected, is in the defendant; and by the defendant, that the wharf was erected by him, and is standing on the shore as is alleged in the indictment. And it is admitted by both, that the landing had been a ferry-way from the time when a ferry was first established across the Penobscot river, in that neighborhood; and that there never was any other ferry near there, till after Penobscot bridge was carried away, in 1846. And it is satisfactorily shown by the evidence, that from the time of its establishment in 1798, to the year 1846, a ferry has been constantly kept there without interruption, for the transportation of passengers on foot, and with horses, teams and carriages, and in the various modes of travel usual on public highways and over ferries. And since the year 1846, a licensed ferry has been kept at the same place, and the ferryman has had control of the landing place since that time. It was also proved, that when the Penobscot river has been covered with ice, the general travel across the river has been from and to the same ferry-way.

The ferry-way has been used for fifty years at least as a landing place for lumber and other materials brought to the shore of the river near that spot, in vessels, boats and rafts, and such as have been designed to be transported therefrom in the same manner.

The charge in the indictment is not for the erection of the wharf, as an interruption of the free passage and navigation of the Penobscot river, but as an obstruction upon the shore of the river, as an impediment to the travel across, to and from the river, upon the highway described in the indictment, in the town of Brewer, and as having greatly obstructed, choked up, narrowed and rendered unsafe and inconvenient the land-

ing place for the citizens of this State, in the use thereof, for the various purposes for which it is alleged it has been appropriated.

It is contended, on the part of the government, that the public had acquired an easement in the shore covered by the wharf erected by the defendant upon the part of the shore described in the indictment, by a dedication thereof; that the defendant's grantor dedicated the same by acts *in pais,* and by deed. Under this position assumed by the counsel for the State, it is proper to see what were the rights of the public, independent of any act of the defendant or of his grantor.

A ferry is a liberty to have a boat for passage upon a river, for the carriage of horses and men for a reasonable toll. It is usually to cross a large river. *Termes de la Ley.* It was provided by the statutes of Massachusetts, in an Act for the regulation of ferries, passed Feb. 14, 1797, that no person or persons whatever, " shall keep a ferry within this Commonwealth so as to demand and receive pay, without a special license first had and obtained from the Court of General Sessions of the peace for the county wherein such ferry may be; and the said Court is hereby empowered to grant such licenses to such person or persons, as shall be judged suitable for such service, by the same Court, and to state the fare or ferriage at each ferry for passengers, horses and other creatures, carriages, wagons, carts and other things, there transported."

The purpose of a ferry necessarily requires such privileges as will make it effectual. Passengers with their horses, carriages, &c., which may be transported, may be received and landed at the margin of the water upon the shore, at all times of the tide and in all states of the river. When the tide is out, and the shore or space between low and high water is partially or wholly bare, passengers may pass over the shore without exposure to pay damages to a riparian proprietor, and without hindrance. When the river is full, the ferry extends to high water mark, and the passenger is entitled to be there landed

with his team and goods transported. The limits of the ferry, consequently, are high water mark on each side of the river.

The highway laid out by the Court of Sessions in the year 1802, by its terms was *to* the ferry; and that of 1824 was *from* the ferry-way at high water mark.

It was decided in Massachusetts, in the case of *Kean* v. *Stetson*, 5 Pick. 492, that the selectmen of a town have no authority to lay out a town way, between high water mark and the channel of a navigable river. And the reason given for the denial of the power will equally apply to the Court of Sessions, or Court of County Commissioners. The Court say, " a public highway cannot be laid out across a navigable stream, except by license from the Legislature. Why? Because it will destroy an existing highway, the river itself, in which all the citizens have an interest."

The highway established in 1802, and that in 1824, could not have extended, by the language used in the records, below high water mark, at the ferry-way; the former being *to the ferry*, and the latter commencing at the westerly terminus, at high water mark. And if the language can admit of a different construction, the location of the highway below high water mark would have had no legal validity.

Before the conveyance of Wilkins to the defendant, he was the owner of the fee in the premises of the deed, not only of the upland, but of the shore between the lines of high and low water, not, however, to the hindrance of the passage of boats and other vessels, in or through the Penobscot river, to other men's houses and lands. Colonial Ordinance of 1641; *Green* v. *Chelsea*, 24 Pick. 71; *Deering* v. *Long Wharf*, 25 Maine, 51; *Storer* v. *Freeman*, 6 Mass. 435; *Lapish* v. *Bank*, 8 Greenl. 85.

Do the public possess any right in the shore covered by the defendant's wharf, by virtue of the reservation in the deed from John Wilkins to him? A reservation has sometimes the force of a saving or exception. Co. Litt. 143. Exception is always a part of a thing granted, and of a thing in being; and a reservation is of a thing not in being, but is newly cre-

ated out of land and tenements devised; though exception and reservation have often been used promiscuously. Co. Litt. 47, (a). And a construction given to a clause, called a reservation, is, that it is an exception, if it will fall within that definition, and if such was the design of the parties. *Bowen* v. *Conner*, 6 Cush. 132. Where land is granted and the right of way is reserved, that right of way becomes in the sense of the law a new thing, derived from the land; and, although before the deed, the grantor had the right of way over the land, wherever he chose to exercise it, yet when he conveyed the land, the reservation was a thing separated from the right of the grantee in the land. *Gay* v. *Walker*, 36 Maine, 54.

In giving a construction to the reservation in the deed from Wilkins to the defendant, we are to ascertain, if possible, from the deed itself, and the situation of the parties, and the relation they hold to the public, the intention which was entertained by the grantor and the grantee. And we think their design was, manifestly, to withhold from the operation of the conveyance of the whole land described, the use then enjoyed by the public of the way, which had been laid out and established from the county road to the river, *as of a thing in being*. The reference must have been made to a particular way, which had been laid out to the river. One way had been laid out to the river from the county road, and used by the public for nearly twenty years, at least, and the case finds, that there was no other road between the county road and the river. This way was across the land described in the deed, and it cannot be doubted, that the reservation actually applied thereto as "the way" then in existence. The fair and plain design of the parties was, that the grantor should relieve himself from all liability, which he would otherwise have been under, if the deed had contained covenants of warranty, on account of the public easement in the highway. *Haynes* v. *Young*, 36 Maine, 557. It was proper that the premises should be so described, as to exhibit precisely, the title as it actually existed in the grantor. The part reserved, therefore,

may be treated as an exception, consistently with the intention of the parties. And the reservation or exception, in the deed, did not embrace the shore of Penobscot river, but was limited in its operation to high water mark.

When the road laid out by the Court of Sessions was discontinued, it ceased as a highway established by record, and the public had no further right therein. Nothing is found in the case tending to show, that it had ever become a public road by such *user* as would create an easement over the ground covered by it, and the question is not presented, whether a road existing by immemorial usage can continue after a discontinuance by a court competent to lay out and establish highways.

Was there dedication by the defendant's grantor of the shore on which the wharf was erected, as a highway?

For a long time serious doubts were entertained by distinguished judges in other States, whether, under the general statutory provisions for laying out and establishing roads and highways, such as have existed in this State, a public highway could be constituted by dedication. But it may now be regarded as a question no longer open, but it is the settled doctrine, that in this mode, ways may be proved to have a legal existence. And it is not necessary that the dedication be made specially, to a corporate body, capable of taking by grant; it may be to the general public, and limited only by the wants of the community. If accepted and used by the public, in the manner intended, it works an estoppel *in pais*, precluding the owner, and all claiming in his right, from asserting an ownership inconsistent with such use. The right of the public does not rest upon a grant by deed, nor upon a twenty years' possession; but upon *the use of the land*, with the *assent of the owner*, for such a length of time, that the public accommodation and private rights might be materially affected by an interruption of the enjoyment. *Pawlett v. Clark*, 9 Cranch, 292; *New Orleans v. United States*, 10 Peters, 662; *Cincinnati v. White*, 6 Peters, 431; *Jarvis v. Dean*, 3 Bing. 447.

To constitute a way by dedication, two things are essential to be proved; the *act of dedication* and the *acceptance* of it on the part of the public. *Marq. Stafford* v. *Coyney,* 7 B. & C. 257; 2 Greenl. Ev. § 662. Whether it has been dedicated or not by the owner of the land, and accepted by the public, is a question of intention, and therefore may be proved or disproved by the acts of the owner, and the circumstances under which the use has been permitted. But it does not follow, that because there is a dedication of a public way by the owner of the soil, and the public use it, the town or other public corporation is bound to keep it in repair. To bind a corporation to this extent, it seems to be required that there should be some proof of acquiescence or adoption by the corporation itself. *Rex* v. *Benedict,* 4 B. & Ald. 447; *Sprague* v. *Waite,* 17 Pick. 309; 2 Greenl. Ev. § 662; *Todd* v. *Rome,* 2 Greenl. 55. But in this State, if the county, town or plantation, against which a suit is brought, or an indictment found, has at any time within six years before the injury, for which damages are sought, made repairs upon the road alleged to be defective, or as . the cause of such injury, it is not competent for such county, town or plantation to deny the location of such road. R. S., c. 25, § 101.

By the proviso in the Colonial ordinance of 1641, that the owner of the flats should not hinder the passage of boats or other vessels in or through any sea, creeks or coves, to other men's houses or lands, persons had a right so to use the shore of Penobscot river, including the right of mooring their vessels thereon, and of discharging and taking in their cargoes. The establishment of the ferry, in 1798, by the Court of Sessions, was neither a restriction nor an enlargement of this right. It did not profess to give to the ferryman or his passengers rights which all did not possess before, in the use of the space denominated the shore of the river. It was providing a convenient mode for the public to pass the river, and authorizing, as a compensation for the services expected to be rendered, a toll, which could not legally be received without authority emanating from the sovereign power of the State.

And the use of the shore, now covered by the defendant's wharf, as a way for travel upon the waters of the river, was the exercise of a right which the owner of the shore could not in the least restrict or abridge; and his assent could not be inferred from the omission to object to that, over which he had no control, when the river was open and in a condition to be used in the passage of vessels and boats. The rights of the riparian proprietor was not changed in the least, when the surface of the river was covered with ice; all the citizens had still a right to traverse the river in that state, at pleasure. *French* v. *Camp*, 18 Maine, 433.

The ordinary reason for the dedication of a way to the public, is not perceived to have had the least foundation in this instance. All the wants of the public in the means of passing the river, which were ever exercised, were fully supplied by the law, and its ministers, in the provision of a mode to pass the water with facility and to communicate with a road which was early laid out by the appropriate authority; and which we are to presume was in a proper condition to be used for the object intended.

The report of the evidence of the case, which is represented therein to be of the whole which was introduced, contains nothing indicative of any positive act of dedication of this shore as a highway, by any proprietor thereof; neither is there any proof having any tendency to show express consent to the use as it was by the public. It does not appear, that his conduct differed in the least from that of any one, who remains silent, when he sees other citizens exercising the privileges which are clearly their own.

It is insisted, in behalf of the State, that if the shore in question did not become a highway by dedication, it was such by *user*.

That highways may have a legal existence from immemorial usage, is certainly a well established principle. Indictments against towns, for the omission to keep in proper repair highways, &c. are often sustained, where there is no proof of their establishment excepting such usage. Long occupation and

enjoyment, unexplained, will raise a presumption of a grant, not only of an easement, but of the land itself; and not only of a grant, but of acts of legislation and matters of record. And grants may be presumed, not only to individuals and corporations, but to the State. *Williams* v. *Cummington*, 18 Pick. 312. But this presumption is predicated upon the existence of some title or right, which is the subject of the grant. No one is presumed to have granted an easement in the right of passage to the public over his land, when that right is in the public to the fullest extent.

The use of the shore, at the place referred to in the indictment, as a way for travel by the public, was a privilege secured by law, as we have seen, and the proprietor thereof could not interfere to hinder that use. No rights of his were invaded thereby, and consequently he had no power to maintain an action for damages which he had never sustained.

The view which we took of the evidence, that there was, as matter of fact, no dedication of this shore to the public, is satisfactory, that the public obtained no rights additional to those which they possessed when they first began their exercise, and that nothing was obtained by them, or lost to the proprietor, by the usage which has been proved; and that no way by *user* has been shown as a matter of law.

By the common law of the State, the proprietor of the lands adjoining the flats, upon and about tide water where the sea ebbs and flows, having property to low water mark in the flats, we are to suppose that some benefit to such owner was designed in the change of what was the common law of England. And it has never been held, that such proprietor has been precluded from erecting wharves and piers upon his own flats, notwithstanding it would prevent the free passage of vessels and boats, so far as the ground was so covered, provided he did not encroach upon the public domain, in materially interrupting the general navigation. And it has been held by this Court, that by the erection of permanent structures, such as wharves and piers, which he may lawfully make on his own land, he acquires thereby no exclusive right,

to the portion remaining open, so as to exclude persons from passing and repassing to and from the land and houses of others. In common with him, the public have the same rights to the open space, which they had before, provided they do not interfere with his permanent erections. *Deering* v. *Long Wharf*, before cited. It has never been understood, that in giving the qualified ownership in flats to the proprietor of the adjoining upland, that he was bound to keep the space forever open, and thereby be prevented from making the improvements, in a harbor having natural advantages as such, so essential to the wants of a people coming from a country where commerce and navigation received the fostering protection of its government, to this land, in which it was early perceived and felt, that prosperity was to be realized in the same great pursuit.

Is the defendant liable under this indictment, on account of having erected the wharf to the great damage and common nuisance of the citizens of this State, upon the shore as a public landing place ?

The affirmative of this question, the counsel for the State does not seem to have seriously maintained in argument, unless the landing place can be treated in law as a highway by dedication or by *user.*

If the defendant was protected in the erection of the wharf, notwithstanding the objections thereto, on the ground that the site on which it stood was a highway, the erection cannot be held as a nuisance, when existing upon the same spot as a landing place.

" A *landing*, even though for the purpose of direct transit, is more than a highway. The relative rights, both of owner and passenger, in a highway, are perfectly understood and dealt with by the law. Subject to the right of mere passage, the owner of the soil is still absolute master." *Pearsall* v. *Post*, 20 Wend. 111 ; same case, 22 Wend. 425.

By the terms of the indictment in the present case, the defendant is charged with having obstructed the landing place, which is alleged to have been occupied from time immemorial

State *v.* Wilson.

without interruption by all the citizens of this State, not only to travel thereon, but to enter upon, deposit, lade and unlade lumber and other materials, land boats, and take water from the river, &c. So far as the public had authority to use the shore under the common law of the State, as declared in the proviso of the Colonial ordinance of 1641, the defendant had no power to impose any hindrance; and this use being continued, would be no foundation for the presumption of a grant. Subject to this public right, his title to the shore was as ample as to the upland, and he would not be restrained from making permanent erections thereon, notwithstanding the same may have been used as a landing place, in addition to its use as a highway.

But if the public had made the shore a place of deposit for lumber, merchandize, &c., in a manner, and to an extent unauthorized by the proviso of the Colonial ordinance, this unauthorized use would not take away any of the rights of the defendant, as they would have existed, independent of such usage. If the deposit upon the flats, as a landing place, was of such a character as to amount to an invasion of the right of the proprietor thereto, it would not differ in principle from a trespass upon his upland; and his remedy might be the same in one case as in the other.

The deposits of lumber, merchandize, &c., such as are alleged to have been made in this indictment upon the shore as a landing place, at the time of the commencement of the same, did not differ from the deposits of wood upon a landing place, in the town of Wells, as appears in the case of *Littlefield* v. *Maxwell,* 31 Maine, 134, and which constituted a trespass, unless they were authorized under the Colonial ordinance. In that case, the deposits were held to have been so made, as to be a profitable use of another's soil; and hence they differed essentially from easements acquired by prescription, in the right of passage over another's land; and the claim to make such use of the land could not be sustained by custom. In the opinion, the case of *Pearsall* v. *Post,* 20 Wend. 111, was relied upon as authority, where the whole matter is

very elaborately considered, and the doctrine deduced from the decisions, which are reviewed, is, that the public has not the right so to use and occupy the soil of an individual adjoining navigable waters, as a public landing and place of deposit of property in its transit, against the will of the owner, although such use has been continued for more than twenty years. The *user* cannot be urged as the foundation of a legal presumption of a grant, and thus justify a claim by prescription; nor as evidence of a dedication of the premises to public use. Prescription will give no right to the exclusive occupation of another's land, as it may give to the traveler the right to pass over it, without the power of halting thereon. *Bethum* v. *Turner,* 1 Greenl. 111; *Cortelyou* v. *Van Brundt,* 2 Johns. 357.

Upon the undisputed testimony, and the admission of facts in the case, the law does not authorize a verdict of conviction against the defendant, and, according to the agreement,

*The verdict is set aside.*

HATHAWAY, APPLETON, MAY and GOODENOW, J. J., concurred.