2011 ME 97

**William A. McGARVEY Jr. et al.**

**v.**

**Steven R. WHITTREDGE et al.**

Supreme Judicial Court of Maine.

Argued: Nov. 10, 2010.
Decided: Aug. 25, 2011.

John P. Foster, Esq. (orally), Kathleen A. Mishkin, Esq., Eastport, ME, for William A. McGarvey, Jr. and Mary Jo Kleintop.

Dennis L. Mahar, Esq. (orally), Teresa E. Stepan, Esq., Fletcher & Mahar, P.A., Calais, ME, for Steven R. Whittredge and Jonathan Bird.

Adam Steinman, Esq. (orally), Neal Weinstein, Esq., Portland, ME, for amicus curiae Surfrider Foundation.

Janet T. Mills, Attorney General, Paul Stern, Dep. Atty. Den., Office of Attorney General, Augusta, ME, for amicus curiae State of Maine.

Sidney St. F. Thaxter, Esq., David P. Silk, Esq., Susan E. Schorr, Esq., Curtis Taxter Stevens Broder & Micoleau LLC, Portland, ME, for amicus curiae Sidney St. F. Thaxter.

Orlando E. Delogu, Esq., University of Maine School of Law, Portland, ME, for amicus curiae Orlando E. Delogu.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, MEAD, GORMAN, and JABAR, JJ.

Concurring: SAUFLEY, C.J., and MEAD and JABAR, JJ.

Concurring: ALEXANDER, LEVY, and GORMAN, JJ.

SAUFLEY, C.J., with whom MEAD and JABAR, JJ., join.

[¶ 1] This case requires us to revisit a question that we have addressed

several times in recent decades: how may the public use intertidal lands on the Maine coast? Specifically, we are asked to determine whether, as a matter of Maine common law, the public has the right to walk across intertidal lands to reach the ocean for purposes of scuba diving. All six justices answer that question in the affirmative. Three justices arrive at this result through the analysis set forth in the discussion section of this opinion, and three justices reach the same result through the analysis articulated in the separate concurrence.

## I. BACKGROUND

[¶ 2] William A. McGarvey Jr. and Mary Jo Kleintop are owners of intertidal land who appeal from a summary judgment entered in the Superior Court (Washington County, *Cuddy, J.*) in favor of Steven R. Whittredge and Jonathan Bird declaring that Whittredge and Bird engaged in a permitted public use of McGarvey and Kleintop's intertidal land when crossing that land to access the ocean for scuba diving. The parties do not dispute the following facts, which are established in the summary judgment record. *See Searle v. Town of Bucksport*, 2010 ME 89, ¶ 2, 3 A.3d 390, 393.

[¶ 3] McGarvey and Kleintop's oceanfront property borders Passamaquoddy Bay in the Town of Eastport. For brevity, we refer to the two property owners as McGarvey. McGarvey's property line extends eastward to the Bay's mean low-water mark and stretches in front of the property of the landowners beside them. Those landowners are Whittredge and Bird, whom we refer to simply as Bird. They own property near the ocean that is bounded to the south and east by the McGarvey property. To the east, the Bird property extends to just below high water where it abuts McGarvey's intertidal land.

[¶ 4] The result of the configuration of land is that the upland Bird property borders the McGarvey intertidal region, and Bird cannot reach the ocean from his property without crossing McGarvey's intertidal land. As we understand the record, Bird does not cross any of the upland portion or dry sand of McGarvey's land to reach McGarvey's intertidal land.

[¶ 5] Bird operates a commercial scuba diving business that takes clients on shore dives in Passamaquoddy Bay. To access the ocean for these dives, Bird and his clients walk with their scuba equipment from Bird's lot onto and across McGarvey's intertidal land where they enter the water. The dives do not involve the use of a boat, and no one engages in any form of fishing or fowling.[1]

[¶ 6] In November 2008, McGarvey filed a declaratory judgment action seeking a determination that Bird has no right to cross McGarvey's intertidal land for scuba diving and seeking an injunction prohibiting such use. Bird counterclaimed seeking a judgment declaring that this use is lawful. McGarvey also alleged trespass related to the scuba diving and the social activities that Bird engaged in on the intertidal land.

[¶ 7] In January 2010, the court granted a summary judgment in favor of Bird, declaring that crossing the McGarvey intertidal land to access the water for recreational or commercial scuba diving is within the public's right to use intertidal land for navigation. The court also concluded that the social activities constituted a trespass and awarded McGarvey and Kleintop

---

1. Much of the scuba diving activity is centered on photographing fish and other sea life.

one dollar together with interest and costs. None of the parties have appealed that latter aspect of the judgment. Thus, although McGarvey initially alleged that Bird and his clients remained on the wet sand for a variety of purposes unrelated to scuba diving, the facts before us for purposes of McGarvey's appeal are narrower. Our analysis focuses solely on the act of walking across the intertidal land to reach the ocean to scuba dive.

## II. DISCUSSION

### A. Common Law Roots of Shoreland Property Rights

[¶ 8] Describing the nature and extent of the public's right to use the intertidal zone has challenged courts in the United States for centuries. Many jurists and authors have struggled to balance the public's rights with the rights of private landowners.

[¶ 9] In Maine, the upland owner ordinarily has fee ownership of the intertidal land, and that private ownership is subject to the public's right to use the intertidal zone.[2] Both the origin of the private ownership of intertidal land and the public's right to use that land are a matter of common law.[3] The common law, with "its flexibility and capacity for growth and adaptation," *Pendexter v. Pendexter,*

363 A.2d 743, 749 (Me.1976) (Dufresne, C.J., concurring), has continually evolved to reflect the realities of a changing world. As this unique body of common law has developed, generations of jurists have searched for a basic set of principles to govern the ownership and use of the intertidal land.

[¶ 10] The common law does not always develop along a straight path. This particular area of common law, involving important competing property interests, certainly has not developed with linear precision. Interpreting the common law available to us, however, we understand the public's right to use the intertidal zone to encompass the right of the public to pass over that land to reach the ocean in order to scuba dive.[4]

[¶ 11] Additionally, because the relevant activity here involves use of the intertidal land only to enter the sea, rather than to stand or to stay, we do not determine whether other, additional uses of the intertidal zone fall within the public trust rights, including the uses related to surfing presented by amicus curiae Surfrider Foundation. Instead, we leave the next question in the evolution of this area of common law for future determination.[5] Today we answer only the question before us: consistent with the common law, may

2. See *Bell v. Town of Wells (Bell II),* 557 A.2d 168, 173 (Me.1989); *Barrows v. McDermott,* 73 Me. 441, 447–49 (1882); *Lapish v. Bangor Bank,* 8 Me. 85, 91–93 (1831).

3. See *Lapish,* 8 Me. at 93; *Storer v. Freeman,* 6 Mass. 435, 438 (1810).

4. See, e.g., *Andrews v. King,* 124 Me. 361, 362–63, 129 A. 298, 298–99 (1925) (discussing the public right to sail over, moor on, land on, and walk across the intertidal land); *French v. Camp,* 18 Me. 433, 435 (1841) (discussing the public trust right of navigation); *Lapish,* 8 Me. at 93 (recognizing the principles of private ownership of the intertidal lands as with-

in the common law); *see also Storer,* 6 Mass. 435.

5. The author of this concurrence acknowledges the inconsistency of this incremental jurisprudential approach with the more direct approach urged unsuccessfully on the Court eleven years ago in the concurrence in *Eaton v. Town of Wells,* 2000 ME 176, ¶ 50, 760 A.2d 232, 248 (Saufley, J., concurring). The passage of time, considerations of stare decisis, and our appreciation for the development of the common law now combine to support a more gradual evolution of this area of property law.

Bird and his guests use McGarvey's intertidal land to reach the ocean to scuba dive? [6]

## B. Property Rights in Maine's Coastal Lands

■ [¶ 12] We begin by recognizing the foundational purpose for the public's rights to the intertidal zone: access to the ocean and tidal region. There can be no question that, pursuant to the original public trust doctrine, the public has a right to use the ocean itself, subject to certain governmental regulation.[7] *See, e.g., Britton v. Dep't of Conservation (Britton I)*, 2009 ME 60, ¶¶ 2, 10 n. 5, 974 A.2d 303, 305, 307; *Norton v. Town of Long Island*, 2005 ME 109, ¶¶ 21, 32, 883 A.2d 889, 896, 899; *see generally Andrews v. King*, 124 Me. 361, 362–63, 129 A. 298, 298–99 (1925); *see also Marshall v. Walker*, 93 Me. 532, 536–37, 45 A. 497, 498 (1900), and cases cited therein. As was written long ago, "It will not be disputed that the sea, which has been called the 'Great highway of the world,' is common to all." *Blundell v. Catterall*, 106 Eng. Rep. 1190, 1194 (1821) (Opinion of Best, J.).

[¶ 13] Just as the public's right to use the ocean is not completely unregulated, however, the public's access to the ocean is not unrestricted. Because each state's law, common and statutory, has developed independently, the rights of the public to reach the ocean differ from state to state. These rights of the public also vary in Maine depending on which of the three zones of property that lead into the ocean is being used—the submerged land below the mean low-water mark; the wet sand of the intertidal zone, which is the shore and flats between the mean high-and low-water marks, but not exceeding 100 rods; and the dry upland sand. *See Britton v. Donnell (Britton II)*, 2011 ME 16, ¶ 6, 12 A.3d 39, 42.

■ [¶ 14] On either side of the intertidal zone, ownership and allowable uses of the land are relatively clear. The State of Maine owns the submerged land *below* the mean low-water mark and holds that land in trust for public uses. *See id.* ¶ 7, 12 A.3d at 42; *Britton I*, 2009 ME 60, ¶¶ 2, 10 n. 5, 974 A.2d at 305, 307; 12 M.R.S. § 1862(2)(A)(6) (2010); *see also Norton*, 2005 ME 109, ¶ 21, 883 A.2d at 896. The State has the authority to lease the submerged land, *see Britton II*, 2011 ME 16, ¶¶ 6–7, 12 A.3d at 42, thereby occasionally limiting the public's access to the covering waters, *see* 12 M.R.S. § 1862 (2010).

■■ [¶ 15] On the dry upland side, the upland owner holds the fee title to the property *above* the mean high-water mark. When oceanfront property includes dry sand, the upland owner, in Maine, owns the dry sand portion of the beach in fee, subject, of course, to any encumbrance. *See Bell v. Town of Wells (Bell II)*, 557 A.2d 168, 170–73 (Me.1989). The public has no special rights to the land above mean high water.

■ [¶ 16] Thus we reach the land at issue in this litigation: the intertidal zone, which is the land between the mean low-water mark and the mean high-water mark. *Flaherty v. Muther*, 2011 ME 32,

---

6. We review the grant of a summary judgment de novo to determine whether Bird was entitled to a judgment as a matter of law. *See* M.R. Civ. P. 56(c); *Beal v. Allstate Ins. Co.*, 2010 ME 20, ¶ 11, 989 A.2d 733, 738.

7. *See, e.g.*, 12 M.R.S. § 6431(1) (2010), *amended by* P.L.2011, ch. 266, § A–9 (effective Sept. 28, 2011) (establishing minimum and maximum length for buying, selling, giving away, transporting, shipping, or possessing lobsters); 12 M.R.S. § 13068–A(4)(A)(3) (2010) (requiring the public to wear proper safety equipment while canoeing or kayaking between January 1st and June 1st).

¶ 1 n. 2, 17 A.3d 640, 646. In Maine, the upland owner also owns this land in fee.[8] *See Britton II*, 2011 ME 16, ¶ 7, 12 A.3d at 42; *see also Dunton v. Parker*, 97 Me. 461, 467, 54 A. 1115, 1118 (1903). All intertidal lands, however, are subject to certain public trust rights that find their foundation in early English law, *see Storer*, 6 Mass. 435, 438 (1810), and often are said to have originally derived from Roman law, *see Bell II*, 557 A.2d at 181 n. 2 (Wathen, J., dissenting), and sources cited therein; *see also Trio Algarvio, Inc. v. Comm'r of the Dep't of Envtl. Prot.*, 440 Mass. 94, 795 N.E.2d 1148, 1150–51 (2003).

## C. Ownership and Use of Intertidal Lands in the United States

[¶ 17] Not surprisingly, the extent of the public's rights of access to, and use of, the intertidal zone has been the subject of litigation in many states, producing diverse results. In several eastern coastal states, including Connecticut and Maryland, the state, rather than the upland owner, owns the intertidal zone in trust for the public, up to the mean high-water mark. *See, e.g., Bloom v. Water Res. Comm'n*, 157 Conn. 528, 254 A.2d 884, 887 (1969) ("The state, as the representative of the public, is the owner of the soil between high- and low-water mark upon navigable water where the tide ebbs and flows."); *Van Ruymbeke v. Patapsco Indus. Park*, 261 Md. 470, 276 A.2d 61, 64–65 (1971) (stating that private landowners bordering tidal waters own to the mean high-water mark); *West v. Slick*, 313 N.C. 33, 326 S.E.2d 601, 617 (1985) ("In North Carolina private property fronting coastal water ends at the high-water mark and the property lying between the high-water mark and the low-water mark known as the 'foreshore' is the property of the State."); *see also* Robin Kundis Craig, *A Comparative Guide to the Eastern Public Trust Doctrines: Classifications of States, Property Rights, and State Summaries*, 16 Penn St. Envtl. L.Rev. 1, 4–5 (2007).

[¶ 18] In Maine, Massachusetts, and Virginia, states whose common law was influenced by colonial ordinances from the 17th Century, *see* Craig at 4, private property immediately adjacent to the ocean extends past the mean high-water demarcation to the mean low-water mark, a historical artifact of the British and colonial attempts to encourage commercial wharf development at private expense. *See Bell v. Town of Wells (Bell I)*, 510 A.2d 509, 513–15 (Me.1986); *Trio Algarvio*, 795 N.E.2d at 1150–51; *Taylor v. Commonwealth*, 102 Va. 759, 47 S.E. 875, 879–80 (1904); *see also State ex rel. Buckson v. Pa. R.R. Co.*, 267 A.2d 455, 459 (Del.1969) (recognizing that private ownership extends to the mean low-water mark of the foreshore); Craig at 33–35, 61–62, 64–67, 105–08.[9]

[¶ 19] In addition to the differing forms of intertidal land ownership, the scope of the public's right to use this specific land also varies significantly among the coastal states. In New Hampshire, where the private ownership only extends to the high-water mark, the public may access the intertidal lands not only for fishing and navigation, but also "for all useful purposes," including recreational

---

8. This is true unless the intertidal lands have been separated by deed from ownership of the adjacent upland. *See, e.g., Flaherty v. Muther*, 2011 ME 32, 17 A.3d 640.

9. *But see* Sir Matthew Hale, *A TREATISE, IN THREE PARTS. PARS PRIMA: De Jure Maris et Brachiorum ejusdem. From a Manuscript of Lord Chief-Justice Hale* 13, 35 (Francis Hargrave, ed., 1st ed. 1787), suggesting that private ownership, subject to a public right of access, existed long before the colonial ordinances were enacted.

uses. *Opinion of the Justices,* 139 N.H. 82, 649 A.2d 604, 608–09 (1994) (quotation marks omitted) (citing other New Hampshire authority). Other states view the public trust rights in the intertidal regions much more narrowly. In Delaware, a state that mirrors Maine in providing for private land ownership to the mean low-water mark, the public trust rights in the intertidal region are restricted to fishing and navigation, and there is no right of the public to walk along the beach or to engage in recreational activities. *See Groves v. Sec'y, Dep't of Natural Res. & Envtl. Control,* No. 92A–10–003, 1994 WL 89804, at *6, 1994 Del.Super. LEXIS 80, at *18 (and cases cited therein).

[¶ 20] In Massachusetts, Virginia, and Maine, colonial ordinances, which were created primarily during the 17th Century and drew from English common law, continue to influence the scope of the public's right to cross the intertidal region in order to reach the ocean. *See Bell I,* 510 A.2d at 514; *Trio Algarvio,* 795 N.E.2d at 1151–52; *Taylor,* 47 S.E. at 880. In these states, the public trust rights generally have been articulated in terms of activities that involve or are incidental to obtaining sustenance or economic benefits through the harvesting of the sea, usually summarized as fishing, fowling, and navigation. *See, e.g., Bell II,* 557 A.2d at 173; *Moot v. Dep't of Envtl. Prot.,* 448 Mass. 340, 861 N.E.2d 410, 412 (2007); *Evelyn v. Commonwealth of Va. Marine Res. Comm'n,* 46 Va.App. 618, 621 S.E.2d 130, 133–34 (2005).

[¶ 21] On the west coast, the development of the common law uses of the intertidal zone has been more generous to the public. For instance, the Supreme Court of California adopted a flexible approach and held that the public trust rights could include uses beyond traditional public uses such as fishing and naviga-

tion. *Marks v. Whitney,* 6 Cal.3d 251, 98 Cal.Rptr. 790, 491 P.2d 374, 380 (1971). The court reasoned, "The public uses to which tidelands are subject are sufficiently flexible to encompass changing public needs." *Id.* The court specifically considered the "growing public recognition that one of the most important public uses of the tidelands ... is the preservation of those lands in their natural state." *Id.*

[¶ 22] In short, there is no uniform system of intertidal land ownership in the United States and no single interpretation of the circumstances under which the public may cross the intertidal lands to reach the ocean. Yet what is common among all legal constructs is the premise that the public may use the intertidal lands in some form to obtain access to the ocean and tidal water.

### D. Ownership and Use of the Intertidal Lands in Maine

[¶ 23] In Maine, we have always recognized private ownership of the intertidal land as a part of our common law. At the same time, the public's right to cross the intertidal zone to reach the ocean has also existed since statehood and, in fact, existed long before our state's inception. *See Bell I,* 510 A.2d at 511–15, and cases cited therein. Accordingly, we return to our historical roots to examine whether the common law of the public trust rights can be understood to include the right to cross the intertidal lands to enter the water to scuba dive.

#### 1. Enactment of the Colonial Ordinance and Its Incorporation in Maine's Common Law

[¶ 24] In Maine, as in Massachusetts, the determination of public and private ownership of the intertidal lands, an area of law derived from the prevailing interpretation of English common law, is now a

matter of state common law. *Shively v. Bowlby,* 152 U.S. 1, 11, 14, 14 S.Ct. 548, 38 L.Ed. 331 (1894); *see Bell II,* 557 A.2d at 181 & n. 2 (Wathen, J., dissenting); *Bell I,* 510 A.2d at 511–12. Originally, the crown held title to the intertidal region, which was believed to be "incapable of ordinary and private occupation, cultivation and improvement" and more appropriately devoted to the public uses of navigation, commerce, and fishing. *Shively,* 152 U.S. at 11–13, 14 S.Ct. 548. The crown's ownership of the intertidal lands consisted of two types: the title, or *jus privatum,* which the crown held absolutely as the sovereign, and the public rights, or *jus publicum,* which the crown held "as the representative of the nation and for the public benefit." *Id.* at 11, 14 S.Ct. 548. The crown could convey intertidal lands to private individuals, but all such conveyances were subject to the *jus publicum. Id.* at 13, 14 S.Ct. 548.

[¶ 25] After the American Revolution, "the people of each state became themselves sovereign; and in that character [held] the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution to the general government." *Martin v. Lessee of Waddell,* 41 U.S. 367, 410, 16 Pet. 367, 10 L.Ed. 997 (1842). In 1988, the United States Supreme Court confirmed that the original thirteen states and all new states acquired title to lands under waters subject to the ebb and flow of the tide and, like the crown in traditional English common law, held the title in trust for the people. *Phillips Petroleum Co. v. Mississippi,* 484 U.S. 469, 473–74, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988); *see Bell II,* 557 A.2d at 181 (Wathen, J., dissenting). Accordingly, each coastal state owned its intertidal lands unless and until it modified this traditional common law.

[¶ 26] In Maine, the common law has been modified to create private ownership of intertidal lands subject to the public trust rights reserved to the State. *See Lapish v. Bangor Bank,* 8 Me. 85, 93 (1831). The historical development of the fee simple private ownership of intertidal lands has been much discussed in our jurisprudence. *See Bell I,* 510 A.2d at 511–15. Key to private ownership of intertidal lands in Maine and Massachusetts was the enactment of the Massachusetts Bay Colony's Colonial Ordinance of 1641–47.[10] *See Bell I,* 510 A.2d at 512–15. Specifically,

---

**10.** The Colonial Ordinance traces its genesis to the "Body of Liberties," which was adopted by the Massachusetts Bay Colony's General Court in 1641 and later expanded. John J. Whittlesey, *Law of the Seashore, Tidewaters and Great Ponds in Massachusetts and Maine* xxxii, xxxv-xxxvii (1932); *see Bell v. Town of Wells (Bell I),* 510 A.2d 509, 512–13 (Me.1986). The 1648 edition of *The Laws and Liberties of Massachusetts* included the Colonial Ordinance, which stated:

Everie Inhabitant who is an hous-holder shall have free fishing and fowling, in any great Ponds, Bayes, Coves and Rivers so far as the Sea ebs and flows, within the precincts of the town where they dwell, unles the Free-men of the same town, or the General Court have otherwise appropriated them. Provided that no town shall appropriate to any particular person or persons, any great Pond conteining more then ten acres of land: and that no man shall come upon anothers proprietie without their leave otherwise then as hereafter expressed; the which clearly to determin, it is declared that in all creeks, coves and other places, about and upon salt water where the Sea ebs and flows, the Proprietor of the land adjoyning shall have proprietie to the low water mark where the Sea doth not ebb above a hundred rods, and not more wheresoever it ebs farther. Provided that such Proprietor shall not by this libertie have power to stop or hinder the passage of boats or other vessels in, or through any sea creeks, or coves to other mens houses or lands.

Whittlesey, *Law of the Seashore, Tidewaters and Great Ponds in Massachusetts and Maine* at xxxvi-xxxvii; *The Book of the General Lauus*

the upland owner's property right in the intertidal zone was articulated in the Colonial Ordinance of 1647. *See The Book of the General Lauus and Libertyes Concerning the Inhabitants of the Massachusetts* (1648), *reprinted in The Laws and Liberties of Massachusetts* 35 (1929) ("[T]he Proprietor of the land adjoyning shall have proprietie to the low water mark where the Sea doth not ebb above a hundred rods, and not more wheresoever it ebs farther."); *Barrows v. McDermott*, 73 Me. 441, 447–48 (1882); *see also Bell II*, 557 A.2d at 171; *Bell I*, 510 A.2d at 512–13.

[¶ 27]   The Colonial Ordinance allowed private ownership of intertidal lands to promote commerce by encouraging the construction of wharves at private expense. *See Storer*, 6 Mass. at 438. In *Storer*, the Massachusetts Supreme Judicial Court summarized the Colonial Ordinance's historical origins as follows:

When our ancestors emigrated to this country, their first settlements were on harbors or arms of the sea; and commerce was among the earliest objects of their attention. For the purposes of commerce, wharves erected below high water mark were necessary. But the colony was not able to build them at the public expense. To induce persons to erect them, the common law of *England* was altered by an ordinance, providing that the proprietor of land adjoining on the sea or salt water, shall hold to low water mark, where the tide does not ebb more than one hundred rods, but not more where the tide ebbs to a greater distance.

*Id.*

[¶ 28]   In acknowledging the existing and unmodified rights of the public, however, the Colonial Ordinance expressly referred to those rights as connected to "fishing," "fowling," and the passage of boats and vessels, which later was summarized as a right of "navigation." John J. Whittlesey, *Law of the Seashore, Tidewaters and Great Ponds in Massachusetts and Maine* xxxvi-xxxvii (1932); *see Bell II*, 557 A.2d at 173.

[¶ 29]   Although the Colonial Ordinance expired by its own terms, the Massachusetts Supreme Judicial Court incorporated the concept of private intertidal ownership set forth in the Colonial Ordinance into its common law in 1810:

This ordinance was annulled with the charter by the authority of which it was made; but, from that time to the present, a usage has prevailed, which now has force as our common law, that the owner of lands bounded on the sea or salt water shall hold to low water mark, so that he does not hold more than one hundred rods below high water mark. . . .

*Storer*, 6 Mass. at 438.

[¶ 30]   Thus, although the private ownership of the intertidal lands announced in the Colonial Ordinance had become a part of Massachusetts common law, the Ordinance itself was not in effect as a matter of positive statutory law at the time that Maine separated from Massachusetts in 1820. *See id.* Additionally, the "Ordinance did not apply to the territory that is now Maine, nor did the legislative body responsible for its enactment have governing authority over that territory." *Bell II*, 557 A.2d at 183 (Wathen, J., dissenting);

---

*and Libertyes Concerning the Inhabitants of the Massachusets* (1648), *reprinted in The Laws and Liberties of Massachusetts* 35 (1929). There are only slight changes in punctuation and spelling in later editions of the Colonial Ordinance. Whittlesey, *Law of the Seashore, Tidewaters and Great Ponds in Massachusetts and Maine* at xxxvii-xl.

*see Conant v. Jordan,* 107 Me. 227, 230, 77 A. 938, 939 (Me.1910) ("At the time this ordinance was adopted, none of the territory now embraced within the State of Maine was a part of, or in any way connected with, the Massachusetts Bay Colony. Therefore the ordinance as a legislative or declaratory act did not then apply to this territory.").

[¶ 31] When Maine achieved statehood in 1820, the Act of Separation and the Maine Constitution incorporated Massachusetts common law into Maine law. Me. Const. art. X, §§ 3, 5; [11] Mass. Laws 1819, ch. 161, § 6; *see Bell I,* 510 A.2d at 513–14. Eleven years later, we confirmed that the prevailing usage of private intertidal land ownership expressed in the Massachusetts court's decision in *Storer* was part of Maine's common law. *Lapish,* 8 Me. at 93 ("Ever since [the *Storer*] decision, as well as long before, the law on this point has been considered as perfectly at rest; and we do not feel ourselves at liberty to discuss it as an open question."). In 1882, we similarly acknowledged that, although the Colonial Ordinance did not extend to Maine by its terms, we regarded the Colonial Ordinance's recognition of private rights as part of the common law of Maine by public and judicial acceptance. *Barrows,* 73 Me. at 447–48; *see Bell I,* 510 A.2d at 513–14; *Conant,* 107 Me. at 230, 77 A. at 939.

[¶ 32] Accordingly, the upland owners' fee ownership of the intertidal zone is solidly established in Maine's common law. *See Britton II,* 2011 ME 16, ¶ 7, 12 A.3d at 42 ("The ownership of the intertidal zone is as land and not a mere easement" (quotation marks omitted)); *Sawyer v. Beal,* 97 Me. 356, 358, 54 A. 848, 848 (1903) ("With-

in the limits of his ownership he has all the exclusive rights of an owner."); *State v. Wilson,* 42 Me. 9, 26, 28 (1856); *see also Commonwealth v. Charlestown,* 18 Mass. 180, 183–84 (1822) (describing the expansive fee simple ownership rights of the riparian owner in Massachusetts).

2. Public Trust Rights in the Intertidal Zone

[¶ 33] Just as solidly established, however, is the public's uninterrupted right to make appropriate use of those lands. *See Marshall,* 93 Me. at 536, 45 A. at 498. As was clarified in 1845, the upland owner has no "exclusive right" to the portion of the flats on which there is no wharf or pier, and "the public have the same rights to the open space, which they had before, provided they do not interfere with his permanent erections." *Deering v. Proprietors of Long Wharf,* 25 Me. 51, 65 (1845).

[¶ 34] Thus, neither the establishment of private ownership rights through the Colonial Ordinance, nor the consequent recognition in common law of private ownership rights, has diminished the public trust rights in the intertidal lands. *See Gerrish v. Proprietors of Union Wharf,* 26 Me. 384, 392 (1847). The challenge, of course, has been to define the extent of the public activities that are subsumed within the trust. We explored this question extensively in *Bell II,* in both the majority and the dissent, *see* 557 A.2d at 173, 185, and we do so again here because declaring the parameters of the common law requires review and evaluation of past uses to provide a context for current uses. *See Pendexter,* 363 A.2d at 749 (Dufresne, C.J., concurring).

---

11. Article X, section 5 of the Maine Constitution reproduces and adopts the Massachusetts Act of Separation. Although section 5 "shall hereafter be omitted in any printed copies [of the Constitution] prefixed to the laws of the State," it retains full force. Me. Const. art. X, § 7; *see also* 1 Laws of Maine 1821 at 45–50 (printing the text of article X, section 5).

[¶ 35]  Important to this analysis is our conclusion that nothing in the Colonial Ordinance, or the pronouncements of the common law that followed in the decades after the expiration of the Ordinance, evidenced an intent to change or limit the *jus publicum*—the public's rights in the intertidal lands—except to the extent that those rights might interfere with the right of the landowner to wharf out.  *See Storer,* 6 Mass. at 438;  *see also Marshall,* 93 Me. at 536, 45 A. at 498;  *Gerrish,* 26 Me. at 392 ("The right to use the waters covering flats between high and low water marks, for the purposes of navigation, was not intended to be abridged by the ordinance of 1641.");  *Lapish,* 8 Me. at 93.

[¶ 36]  These uses reserved to the public before the adoption of the Colonial Ordinance were described in various ways. As Sir Matthew Hale described them,

> For the *jus privatum* of the owner or proprietor is charged with and subject to that *jus publicum* which belongs to the king's subjects; as the soil of an highway is, which though in point of property it may be a private man's freehold, yet it is charged with a publick interest of the people, which may not be prejudiced or damnified.

Sir Matthew Hale, *A TREATISE, IN THREE PARTS. PARS PRIMA: De Jure Maris et Brachiorum ejusdem. From a Manuscript of Lord Chief–Justice Hale* 13, 35 (Francis Hargrave ed., 1st ed. 1787).

[¶ 37]  Were it not for the specific and somewhat contradictory language contained in our most recent discussion of the public's rights, *see Bell II,* 557 A.2d at 173, we would have no difficulty in determining that the judicially accepted "expansive" definition of the public's rights would readily accommodate the right to walk across the intertidal zone to scuba dive. Indeed, well before *Bell II,* our courts had consistently acknowledged that the public trust rights in the intertidal land adapted to reflect the realities of use in each era. *See id.* at 173 & n. 16;  *Marshall,* 93 Me. at 536–37, 45 A. at 498.

[¶ 38]  Until our decision in *Bell II,* 557 A.2d at 173, we had never treated the language of the Colonial Ordinance as permanently defining or circumscribing the sum of the public's rights to the intertidal zone.  For example, the Colonial Ordinance referred to the right of free fishing as available to "Everie Inhabitant who is an hous-holder."  *See* Whittlesey, *Law of the Seashore, Tidewaters and Great Ponds in Massachusetts and Maine* at xxxvi;  *see also Duncan v. Sylvester,* 24 Me. 482, 486 (1844);  *Parker v. Cutler Milldam Co.,* 20 Me. 353, 357–58 (1841).  Later, however, we construed the right as one belonging not just to householders but also to the "public."  *See Andrews,* 124 Me. at 363–64, 129 A. at 299;  *Marshall,* 93 Me. at 536–37, 45 A. at 498 ("[T]he public may enjoy all these rights in common with the owner [of intertidal land].").  We similarly declined to give effect to the language of the Colonial Ordinance that restricts free fishing to locations "within the precincts of the town where [householders] dwell."  *See State v. Leavitt,* 105 Me. 76, 80–82, 72 A. 875, 877–78 (1909) (upholding legislation that excepted inhabitants of towns from restrictions on clamming, but noting that, where towns did not issue permits or otherwise "take action," "there is free fishing for every one").

[¶ 39]  Just as we have not treated the Colonial Ordinance as defining or restricting which member of the "public" would receive the benefit of the *jus publicum,* we had not, until *Bell II,* restricted the activities allowed by the *jus publicum* to the specific references in the Colonial Ordinance: "free fishing and fowling," and unhindered "passage of boats or other

vessels." *The Laws and Liberties of Massachusetts* at 35. Rather, we have adopted a broad understanding of "fishing," "fowling," and "navigation," as well. *See Parker*, 20 Me. at 357–58; *French*, 18 Me. at 433, 434–35 (1841) (discussing the public trust right of navigation). We held that these activities could be undertaken for pleasure, as well as for business or sustenance, *Barrows*, 73 Me. at 449–50; *see Andrews*, 124 Me. at 363–64, 129 A. at 298–99 (holding that the public trust rights also include commercial navigation and allow a person who operates a power boat for hire to land the boat on the intertidal land). We construed the term "fishing" in the Colonial Ordinance to include digging for worms, *State v. Lemar*, 147 Me. 405, 409, 87 A.2d 886, 888 (1952), clams, *Leavitt*, 105 Me. at 78–80, 72 A. at 876–77, and shellfish, *Moulton v. Libbey*, 37 Me. 472, 489–90 (1854). We interpreted "navigation" to allow the public to travel over frozen waters, *see French*, 18 Me. at 434–35, and to moor a vessel, discharge passengers, and take on cargo, *see Wilson*, 42 Me. at 24–25.

[¶ 40] Pursuant to our broad understanding of the public trust rights, we have authorized public uses that are somewhat related to, but not coextensive with, "fishing," "fowling," and "navigation." For example, upon landing a boat on the intertidal land, we held that the operator, no longer navigating on the water, also may "pass freely to the lands and houses of others besides the owners of the flats." *Deering*, 25 Me. at 65; *see Andrews*, 124 Me. at 363, 129 A. at 299. We even concluded, without a direct connection to fishing, fowling, and navigation, that the public may lawfully cross intertidal lands by riding or skating when that land is covered with ice.[12] *See Marshall*, 93 Me. at 536–

37, 45 A. at 498. Moreover, our interpretation of the public trust rights has recognized that some intertidal activities have come into favor and eventually fallen out of use—many of which are not directly connected to "fishing," "fowling," and "navigation"—such as the use of the intertidal lands for pre-automobile travel and the use of those lands for driving and resting cattle. *See Bell II*, 557 A.2d at 173 n. 15.

[¶ 41] Despite our expanding interpretation of the rights of the public in relation to private ownership of intertidal lands, an interpretation we characterized as "sympathetically generous" in *Bell II*, 557 A.2d at 173, we also defined the public's rights in a manner that did not unreasonably interfere with the rights of the riparian owner. *See McFadden v. Haynes & DeWitt Ice Co.*, 86 Me. 319, 325, 29 A. 1068, 1069 (1894) (stating that the public trust rights do not include cutting ice on the intertidal flats); *Moore v. Griffin*, 22 Me. 350, 356 (1843) (holding that the public trust rights do not include the taking of mussel-bed manure from the intertidal land of another). Similarly, the public trust rights have excluded the use of the intertidal land for hygienic, bathing-related purposes. *See Butler v. Attorney General*, 195 Mass. 79, 80 N.E. 688, 689 (1907). Thus, until the decision in *Bell II*, 557 A.2d 168, the common law developed along lines that were generous to the public, but continued to balance that expansive approach against the upland owners' rights.

### 3. Recent Maine Common Law

[¶ 42] Such was the development of Maine common law related to the intertidal zone until our holdings in *Bell I*, 510 A.2d 509, and *Bell II*, 557 A.2d 168, in 1986 and 1989. In *Bell I*, owners of shorefront

---

12. In Massachusetts, the public also may use the intertidal lands to swim, but not to bathe. *See Butler v. Attorney General*, 195 Mass. 79, 80 N.E. 688, 689 (1907).

property in the Moody Beach area filed suit against the Town of Wells, the State, and several unnamed individuals on the ground that unnamed individuals have used the intertidal zone for activities other than fishing, fowling, and navigation, with the encouragement of the Town. 510 A.2d at 510. The owners sought a declaratory judgment that the public rights on the beach were limited to these three activities. *Id.*

[¶ 43] In the first appeal, we concluded that the Colonial Ordinance was incorporated into Maine's common law pursuant to article ten, section three of the Maine Constitution and section six of the Act of Separation between Maine and Massachusetts, and that our later holdings clearly recognized the validity of the Colonial Ordinance as a part of our common law. *Id.* at 513–14. Although we noted that the Colonial Ordinance recognized private ownership of the intertidal lands, we again clarified that the private title remained "subject to the public right of use declared by the Colonial Ordinance." *Id.* at 516.

[¶ 44] On April 25, 1986, while the *Bell I* appeal opinion was pending, the Maine Legislature enacted The Public Trust in Intertidal Land Act, P.L.1985, ch. 782 (codified at 12 M.R.S. §§ 571–573 (2010)). *See Bell II*, 557 A.2d at 190 (Wathen, J., dissenting). The Act provided that the intertidal lands were impressed with a public trust, that the public trust included use of the intertidal land for fishing, fowling, navigation, recreation, and "[a]ny other trust rights to use intertidal land recognized by the Maine common law and not specifically abrogated by statute." 12

M.R.S. § 573(1); *see Bell II*, 557 A.2d at 190 (Wathen, J., dissenting).

[¶ 45] Upon remand in *Bell I*, the Superior Court held a four-week bench trial. *Bell II*, 557 A.2d at 169. The court entered a judgment in favor of the property owners that declared The Public Trust in Intertidal Land Act, *see* 12 M.R.S. §§ 571–573, unconstitutional because it expanded the public's trust rights beyond that established by the common law. *Bell II*, 557 A.2d at 169. The court also concluded that the public had not acquired a common law easement for general recreational use and found insufficient evidence to establish a public easement by local custom to use the beach for recreational purposes. *Bell II*, 557 A.2d at 173–79.

[¶ 46] Notwithstanding earlier approved common law activities that were not defined within the three enumerated uses, in *Bell II* we held that the public trust rights to the intertidal lands did not include a general recreational easement. *Id.* at 176. We stated that the public trust rights had never been divorced from "fishing," "fowling," and "navigation," but also that these uses had been given a "sympathetically generous" and broad construction in Maine's common law. *Id.* at 173.

[¶ 47] Writing for the three-member dissent, then-Justice Wathen concluded that a reasonable interpretation of the public rights in intertidal zones extends beyond "fishing," "fowling," and "navigation" and includes "other recreational uses [that] have developed and received public acceptance." [13] *See Bell II*, 557 A.2d at 188–89 (Wathen, J., dissenting). [14]

---

13. In the dissent's view, the majority's approach to intertidal property ownership was "premised upon the erroneous assumption that the Colonial Ordinance is the exclusive and preeminent source of all public rights." *Bell II*, 557 A.2d at 180 (Wathen, J., dissenting).

14. Eleven years later, we addressed a beachfront property dispute that involved a portion of the beach in the Town of Wells that historically was used by the public without the permission of the upland shore owners. *Eaton v. Town of Wells*, 2000 ME 176, ¶ 49, 760 A.2d 232, 248. *Eaton* held that the public and the

#### 4. Scuba Diving and the Public Trust Rights

[¶ 48]  Accepting *Bell II's* description of the public's rights in the intertidal zone as excluding a general recreational easement, *see* 557 A.2d at 173, we turn to the narrow issue before us: whether in the context of Maine's common law as addressed above, the public has a right to cross the intertidal portion of the beach on the private owner's property to reach the ocean to scuba dive.  Although several amici curiae invite us to assess more broadly whether the public trust rights include a general, or more limited, recreational easement to use the intertidal lands, that issue is neither before us nor necessary to the resolution of this case.  *See Dickey v. Vermette,* 2008 ME 179, ¶ 1, 960 A.2d 1178, 1179 (2008) (declining to reach an issue raised by amicus curiae but not essential to the opinion).

[¶ 49]  To undertake our analysis, we ask two questions.  First, does the intended activity fall readily within the *Bell II* categories of "fishing," "fowling," or "navigation"?  If so, there is no need to continue further.  If not, it is necessary to determine whether the common law should be understood to include that activity—here specifically the right of passage over the intertidal sand to reach the water to scuba dive.

[¶ 50]  Beginning with the first question, although our colleagues in concurrence have concluded that some forms of non-boat-related propulsion through the water, including scuba diving, can be found to constitute a form of "navigation," we conclude that such an analysis requires stretching the definition of navigation beyond its meaning.  Instead, we will determine whether Bird's purpose for crossing the intertidal zone is among the purposes

consistent with the common law of the *jus publicum,* even when such access is for activities that do not strictly fall within the triumvirate of descriptors.  *Cf. Bell II,* 557 A.2d at 173.

[¶ 51]  Moving then to the second question, we conclude that, although not expressly stated in any one opinion, our common law has regularly accommodated the public's right to cross the intertidal land to reach the ocean for ocean-based activities.  The list of uses that have been accepted within the common law, but which do not fall strictly within the definitions of "fishing," "fowling," and "navigation," is significant.  *See supra* ¶¶ 38–40.  As we have held, the public may engage in activities that are not directly related to the three descriptors.  *See, e.g., Marshall,* 93 Me. at 536–37, 45 A. at 498; *Deering,* 25 Me. at 65; *cf. Moulton,* 37 Me. at 489.

[¶ 52]  We must also acknowledge, as the concurrence notes, that our language in *Bell II* appears to set in stone the three talismanic activities to which the walk to the ocean must be tied: "fishing," "fowling," and "navigation."  *See* 557 A.2d at 173.  Resigned to those categories in light of principles of stare decisis, the concurrence has found a way to define "navigation" generously, as including scuba diving.

[¶ 53]  Rather than stretching the definitions of these three terms beyond their reasonable limits, however, we return to the roots of the common law.  Ultimately, the public trust rights in the intertidal zone are not, and have never been, strictly enumerated rights.  To the extent that *Bell II* can be read to forever set the public's rights in stone as related to only "fishing," "fowling," and "navigation," we would expressly disavow that interpreta-

---

Town had a prescriptive easement to use both the intertidal zone and the dry sand portion of the beach.  *Id.* Therefore, the opinion did not reach the issue of whether the public trust rights involved activities beyond fishing, fowling, and navigation.  *Id.*

tion. We believe the better approach is to extract the principles upon which the *Bell II* opinion was decided and evaluate those principles in light of the centuries-old jurisprudence governing ownership and use of the intertidal lands. *See Shaw v. Jendzejec*, 1998 ME 208, ¶ 9, 717 A.2d 367, 371 (discussing principles involved when the Court determines whether a prior decision should be overruled).

[¶ 54] We must also respectfully disagree with the concurring opinion's conclusion that courts must strictly adhere to principles of stare decisis when addressing the development of the common law. "[T]he common law gives expression to the changing customs and sentiments of the people," *State v. Bradbury*, 136 Me. 347, 349, 9 A.2d 657 (1939), and its genius is the "flexibility and capacity for growth and adaptation," *Pendexter*, 363 A.2d at 749 (Dufresne, C.J., concurring). "While we recognize the unquestioned need for the uniformity and certainty the doctrine [of stare decisis] provides, we have also previously recognized the dangers of a blind application of the doctrine merely to enshrine forever earlier decisions of this court." *Adams v. Buffalo Forge Co.*, 443 A.2d 932, 935 (Me.1982).

[¶ 55] As is clear from the history of our cases, long before *Bell II* was decided, the public's use of the intertidal zone was not so severely limited that only a person with a fishing rod, a gun, or a boat could walk upon that land. Indeed, a careful reading of *Bell II* demonstrates that limiting the public trust rights narrowly to *precisely* the three uses specifically referenced in the Colonial Ordinance would conflict with our acknowledgement in *Bell II* of the need for a "sympathetically generous" assessment of those very rights.[15] *Bell II*, 557 A.2d at 173.

[¶ 56] In short, our judicial unease with a rigid interpretation of the public trust rights urges clarification of the *Bell II* holding's scope. *See Shaw*, 1998 ME 208, ¶¶ 8–9, 717 A.2d at 370–71. Warping and straining the definitions of "fishing," "fowling," and "navigation" to include such modern uses as clamming, worming, skating, or scuba diving, creates further confusion as to authorized public usage of intertidal lands. The three terms adequately provide context, but they simply do not and have never, until *Bell II*, been understood to wholly or exclusively define the public trust rights.

[¶ 57] In the end, to the parties before us, it does not matter whether the public's rights to cross the intertidal land to reach the ocean to scuba dive is a matter of general common law, or is liberally classified as a form of "navigation." In either event, all six justices conclude that it is an

---

15. The *Bell II* court found as "persuasive precedent" two Massachusetts cases: Butler, 80 N.E. at 689 (holding that the public rights in the intertidal zone do not extend to public bathing), and *Michaelson v. Silver Beach Improvement Ass'n, Inc.*, 342 Mass. 251, 173 N.E.2d 273, 278 (1961) (holding that an artificial beach created in front of private shorefront properties created by public dredging belonged to the owners through the doctrine of accretion, and that other property owners in the vicinity should be enjoined from using the new beach for bathing purposes in the intertidal zone). *Bell II*, 557 A.2d at 174–75. *Bell II* also relied on a 1974 advisory opinion by the Massachusetts Supreme Judicial Court justices, *Opinion of the Justices*, 365 Mass. 681, 313 N.E.2d 561, 564, 568 (1974) (regarding as unconstitutional proposed legislation that would create a "public on-foot free right-of-passage" along the state's intertidal zone). *Bell II*, 557 A.2d at 175. We do not find these authorities persuasive for the proposition that the public may not traverse the intertidal lands to reach the ocean for purposes other than fishing, fowling, and navigation. Significantly, the issue of a general recreational easement in the intertidal land is not before us today, and these authorities are not controlling precedent.

allowable activity. For clarity of the development of the common law, however, we would not shoehorn scuba diving into the definition of "navigation." Instead, as have the jurists before us, we would continue to strike a reasonable balance between private ownership of the intertidal lands and the public's use of those lands.

## III. CONCLUSION

[¶ 58] Although Maine has a rich history of private ownership of intertidal lands, that ownership has always been subject to the public's right to cross the wet sand to reach the ocean. As Sir Matthew Hale originally described the public's rights to this important land, "the people have a publick interest, a *jus publicum*, of passage and repassage with their goods by water, and must not be obstructed by nuisances or impeached by exactions." Hale, *De Jure Maris* at 36. In our view, pursuant to the common law of Maine, the public trust rights are at least broad enough to allow the public to walk across the intertidal lands to enter the water and scuba dive.

LEVY, J., with whom ALEXANDER and GORMAN, JJ., join.

[¶ 59] The public's common law right to use Maine's intertidal lands has historically been defined using the terms "fishing, fowling, and navigation." *See Bell v. Town of Wells (Bell II)*, 557 A.2d 168, 173 (Me.1989); *Marshall v. Walker*, 93 Me. 532, 536–37, 45 A. 497, 498 (1900). In *Bell II*, the Court's majority unequivocally stated: "The terms 'fishing,' 'fowling,' and 'navigation,' liberally interpreted, delimit the public's right to use this privately owned land." 557 A.2d at 173 (footnote omitted). Today, however, the separate opinion of my colleagues in concurrence suggests an approach that would effectively overrule *Bell II* by concluding that

"[t]he three terms adequately provide context, but they simply do not and have never, until *Bell II*, been understood to wholly or exclusively define the public trust rights." Saufley Concurring Opinion ¶ 56. Further, that approach would bestow upon the public a general right to cross privately-owned intertidal land to gain access to the ocean—a newfound right that would exceed even the most "sympathetically generous" interpretation of fishing, fowling, and navigation. *See Bell II*, 557 A.2d at 173. I do not agree with such an expansion of Maine's common law because, in my view, it would violate the doctrine of *stare decisis* and misapply the Court's common law authority.

A. The Public's Common Law Right to Use the Intertidal Land is Limited to Fishing, Fowling, and Navigation

[¶ 60] In *Bell II*, the Court's majority surveyed more than one and one-half centuries of Maine decisions regarding the public's right to use the intertidal land and concluded that the public has no common law right to engage in general recreation. 557 A.2d at 173, 176. That decision recognized that the public's rights in this sphere have never been divorced from the three public uses reserved in the Colonial Ordinance—fishing, fowling, and navigation: "The Colonial Ordinance as received into the common law of Maine and Massachusetts reserved out of the fee title granted to the upland owner a public easement only for fishing, fowling, and navigation." *Id.* at 173.

[¶ 61] *Bell II* did not treat the terms fishing, fowling, and navigation as shorthand or code for broader public trust rights untethered to these three enumerated uses. The *Bell II* majority opinion explained:

We have held that the public may fish, fowl, or navigate on the privately owned

land for pleasure as well as for business or sustenance, *Barrows v. McDermott,* 73 Me. [441, 449 (1882)]; and we have in other ways given a sympathetically generous interpretation to what is encompassed within the terms "fishing," "fowling," and "navigation," or reasonably incidental or related thereto. For example, the operator of a power boat for hire may pick up and land his passengers on the intertidal land, *Andrews v. King,* 124 Me. 361, 129 A. 298 (1925); and "navigation" also includes the right to travel over frozen waters, *French v. Camp,* 18 Me. 433 (1841), to moor vessels and discharge and take on cargo on intertidal land, *State v. Wilson,* 42 Me. [9, 24 (1856)]; and, after landing, "to pass freely to the lands and houses of others besides the owners of the flats," *Deering v. Proprietors of Long Wharf,* 25 Me. 51, 65 (1845). Similarly, we have broadly construed "fishing" to include digging for worms, *State v. Lemar,* 147 Me. 405, 87 A.2d 886 (1952), clams, *State v. Leavitt,* 105 Me. 76, 72 A. 875 (1909), and shellfish, *Moulton v. Libbey,* 37 Me. 472 (1854). We have never, however, decided a question of the scope of the intertidal public easement except by referring to the three specific public uses reserved in the Ordinance. The terms "fishing," "fowling," and "navigation," liberally interpreted, delimit the public's right to use this privately owned land. 557 A.2d at 173 (footnote omitted).

[¶ 62] To "delimit" means "to fix or determine the limits of." Webster's Third New International Dictionary 597 (2002). It is true that we have historically applied what the concurrence alternately describes as an "expansive," "liberal," "broad," and "sympathetically generous" approach to the public's right to use intertidal lands. Saufley Concurring Opinion ¶¶ 37, 39, 40, 41, 57. With that approach, we have, over time, greatly expanded the scope of the "public" that benefits from the right to fish, fowl, and navigate, and we have construed those terms far beyond their traditional meanings. We have never understood fishing, fowling, and navigation to merely establish a context for some broader right or rights. By asserting that fishing, fowling, and navigation do not "wholly or exclusively define the public trust rights," Saufley Concurring Opinion ¶ 56, the concurrence proposes a holding that would fundamentally alter, rather than merely expand, Maine's existing common law.

## B. Stare Decisis

[¶ 63] The doctrine of *stare decisis* "is the historic policy of our courts to stand by precedent and not to disturb a settled point of law." *Myrick v. James,* 444 A.2d 987, 997 (Me.1982). It exists because respect for legal precedent lends stability to the law and enables the public to place reasonable reliance on judicial decisions affecting important matters. Even when we have a certain "unease" with the analysis of a prior decision, we do not overrule the decision without a compelling and sound justification. *See Shaw v. Jendzejec,* 1998 ME 208, ¶¶ 8, 12, 717 A.2d 367, 370–71, 371–72; *Alexandre v. State,* 2007 ME 106, ¶ 35, 927 A.2d 1155, 1164.

[¶ 64] Society's interest in being able to rely on established precedent is at its apex with regard to judicial precedents that exposit property rights. *See Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 381, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977). Legal questions affecting ownership of land, once answered, "should be considered no longer doubtful or subject to change." *United States v. Title Ins. & Trust Co.,* 265 U.S. 472, 486–87, 44 S.Ct. 621, 68 L.Ed. 1110 (1924) (quotation marks omitted). "Such decisions become rules of property, and many

titles may be injuriously affected by their change." *Id.* at 486, 44 S.Ct. 621 (quotation marks omitted).

[¶ 65]   In *Bell v. Town of Wells (Bell I),* we noted the importance of *stare decisis* and "the stability of the legal concepts of property in the State," and in connection with our common law's adherence to the principles of the Colonial Ordinance, we quoted the decision of the Massachusetts Supreme Judicial Court in *Barker v. Bates,* 30 Mass. 255, 258 (1832):

> [I]t would be extremely injurious to the stability of titles, and to the peace and interests of the community, to have [private ownership of intertidal land] seriously drawn in question.   It is founded upon a usage and practice so ancient, immemorial and unvarying, that without tracing its precise origin, it must now be deemed a rule of common law proved by such usage.

*Bell I,* 510 A.2d 509, 513, 518 (Me.1986) (quotation marks omitted); *see also Barrows,* 73 Me. at 448 ("[the Colonial Ordinance] has been so largely accepted and acted on by the community as law that it would be fraught with mischief to set it aside").   The *Bell II* majority continued to respect the property rights of fee owners of intertidal lands by holding that the establishment of a public easement that exceeds uses within the scope of fishing, fowling, and navigation is an unconstitutional taking of private property without just compensation, whether the easement is created by the Legislature or the judiciary.   *See Bell II,* 557 A.2d at 176, 177–79,

180;   *see also Opinion of the Justices,* 365 Mass. 681, 313 N.E.2d 561, 569–71 (1974) (declaring that proposed legislation creating a footpath along privately-owned intertidal land would constitute an unconstitutional taking).

[¶ 66]   Because Maine's roughly 3500 miles of ocean coastline [16] are a defining feature of both the state and its people, any judicial decision that reformulates the legal standard by which the competing rights of private landowners and the public to use intertidal land are determined must explicitly account for the principle of *stare decisis.*   The concurrence would chart a course that is in plain conflict with *Bell II* without providing compelling and sound justification for this new direction. [17]

[¶ 67]   The   standard   ultimately   proposed by the concurrence—that the Court will henceforth "strike a reasonable balance between private ownership of the intertidal lands and the public's use of those lands"—would be bounded only by what a majority of the Court determines to be reasonable at any given time.   Saufley Concurring Opinion ¶ 57.   With this new approach, the jurisprudential anchor provided by the terms fishing, fowling, and navigation would be lifted, and with it, the guidance and stability that those terms have brought to property rights would be lost.   We should remain true to the doctrine of *stare decisis* and not effectively overrule our decision in *Bell II.*

## C.   The Common Law Approach

[¶ 68]   In *Bell II,* we acknowledged, consistent with our long-standing approach

---

**16.**   *See* Nat'l Oceanic & Atmospheric Admin., *Ocean and Coastal Management in Maine,* http://coastalmanagement.noaa.gov/mystate/ me.html (last visited August 22, 2011).

**17.**   *Bell II* was decided in 1989, and it remains binding precedent that provides a clear and reasoned explanation of the public and private rights inherent in the intertidal zone un-

der Maine's common law.   In the ensuing years, we have not reexamined *Bell II* or questioned its vitality other than in a concurring opinion by one Justice in *Eaton v. Town of Wells,* 2000 ME 176, ¶¶ 50–55, 760 A.2d 232, 248–50 (Saufley, J., concurring) (asserting that *Bell II* was incorrectly decided and urging that it should be overruled).

to the common law development of the public's rights in the intertidal zone, that the terms fishing, fowling, and navigation have been and should be given a "sympathetically generous" and broad interpretation. *See Bell II,* 557 A.2d at 173. As the concurrence acknowledges, we have expanded other aspects of the public's rights in intertidal lands based on the three enumerated public uses so as to account for evolving social and commercial circumstances. Although the plain language of the Ordinance grants free fishing to "Everie Inhabitant who is an hous-holder," *The Book of the General Lauues and Libertyes Concerning the Inhabitants of the Massachusets* (1648), *reprinted in The Laws and Liberties of Massachusetts* 35 (1929), that right, which we early-on described with reference to "householder[s]," was later regarded as a right of the "public." *See Parker v. Cutler Milldam Co.,* 20 Me. 353, 357–58 (1841); *Duncan v. Sylvester,* 24 Me. 482, 486 (1844); *Marshall,* 93 Me. at 536–37, 45 A. at 498 ("the public may enjoy all these rights [including fishing] in common with the owner [of intertidal land]"); *Andrews,* 124 Me. at 363, 129 A. at 299. We have also eliminated the effect of the language of the Colonial Ordinance that restricts free fishing to "within the precincts of the town where [the householders] dwell." *See Leavitt,* 105 Me. at 80, 81–82, 72 A. at 877–78 (quotation marks omitted) (upholding legislation that excepted inhabitants of a town from restrictions on clamming, but noting that where towns did not issue permits, "there is free fishing for every one"). Additionally, we have broadly interpreted the right expressed in the Colonial Ordinance of "passage of boats or other vessels . . . to other men's houses and lands" to include the right to moor vessels on intertidal lands and discharge and take on cargo or ferry passengers. *See Deering,* 25 Me. at 64–65 (quotation marks omitted); *An-*

*drews,* 124 Me. at 364, 129 A. at 299. We have also made clear that the right of navigation extends to commercial and recreational uses. *See Andrews,* 124 Me. at 364, 129 A. at 299.

[¶ 69] A sympathetically generous and broad interpretation of the public's rights is not, however, without limits. *See McFadden v. Haynes & DeWitt Ice Co.,* 86 Me. 319, 325, 29 A. 1068, 1069 (1894) (stating that the public right of fishing does not include cutting ice in intertidal areas); *Moore v. Griffin,* 22 Me. 350, 356 (1843) (holding that the public right of fishing does not include the taking of mussel-bed manure from the intertidal land of another). In *Bell II,* we followed two Massachusetts cases that held that the public's right to use intertidal land does not include "bathing." 557 A.2d at 175 (citing as persuasive precedent, *Butler v. Attorney General,* 195 Mass. 79, 80 N.E. 688 (1907), and *Michaelson v. Silver Beach Improvement Ass'n, Inc.,* 342 Mass. 251, 173 N.E.2d 273 (1961)).

[¶ 70] Since our earliest decisions concerning ownership and use of intertidal lands, we have adhered to our common law approach centered on the three enumerated public uses. *See, e.g., Bell II,* 557 A.2d at 171, 173; *accord id.* at 183 (Wathen, J., dissenting); *Bell I,* 510 A.2d at 513–15; *Lapish v. Bangor Bank,* 8 Me. 85, 93 (1831). That approach has not prevented us from accounting for the ever-changing circumstances of society when applying the principles of the Colonial Ordinance. *See Barrows,* 73 Me. at 448–50; *Woodman v. Pitman,* 79 Me. 456, 460–63, 10 A. 321, 323–25 (1887) (recognizing the emergence of the ice harvesting industry and the declining need for travel on frozen navigable waterways). We do not rigidly apply ancient common law principles without considering the changed realities of modern

times. This approach was described eloquently in *Woodman:*

> The inexhaustible and ever-changing complications in human affairs are constantly presenting new questions and new conditions which the law must provide for as they arise; and the law has expansive and adaptive force enough to respond to the demands thus made of it; not by subverting, but by forming new combinations and making new applications out of, its already established principles,—the result produced being only "the new corn that cometh out of the old fields."

79 Me. at 458, 10 A. at 322. The common law requires courts to account for "the ever varying circumstances of new cases presented and ... the newly developed industries of the age [while not] setting aside its plain doctrines because they are not in accord with our own views of what it should be." *Barrows,* 73 Me. at 449–50; *see also In re Robinson,* 88 Me. 17, 23, 33 A. 652, 654 (1895) ("The common law would ill deserve its familiar panegyric as the 'perfection of human reason,' if it did not expand with the progress of society and develop with new ideas of right and justice.").

[¶ 71] In short, we should apply, as have the generations of Maine jurists that have preceded us, a sympathetically generous and broad interpretive approach when construing the uses arising from the public trust rights in Maine's intertidal lands, but we should do so without deviating from the core requirement that the uses are delimited by the terms fishing, fowling, and navigation as these terms have and will continue to evolve.

### D. Whether Scuba Diving is a Form of "Navigation"

[¶ 72] Framed in terms of Maine's established common law, the question this case ultimately presents is whether, as the Superior Court determined, scuba diving is an activity within the ambit of the enumerated public right of navigation. McGarvey and Kleintop assert that navigation requires the use of a boat or vessel, the traditionally identified instruments used to navigate through the water. They also argue that scuba diving involves underwater swimming, and because "bathing" was a facet of the general recreational activity that we considered and rejected in *Bell II,* our decision in *Bell II* should control. *See Bell II,* 557 A.2d at 174–76.

[¶ 73] The majority in *Bell II* explicitly relied on *Butler,* a 1907 Massachusetts decision, to support the proposition that bathing, an aspect of the asserted right of general recreation, is not within the public's right to use intertidal lands. *See Bell II,* 557 A.2d at 175 (citing *Butler,* 80 N.E. 688). The *Butler* court explained:

> In the seashore the entire property, under the colonial ordinance, is in the individual, subject to the public rights. Among these is, of course, the right of navigation, with such incidental rights as pertain thereto. We think that there is a right to swim or float in or upon public waters as well as to sail upon them. But we do not think that this includes a right to use for bathing purposes, as these words are commonly understood, [the intertidal areas] of the beach or shore ... whether covered with water or not. It is plain, we think, that under the law of Massachusetts there is no reservation or recognition of bathing on the beach as a separate right of property in individuals or the public under the colonial ordinance.

80 N.E. at 689 (citations omitted). The *Butler* court concluded that intertidal lands are held in fee "subject ... to the easement of the public for the purposes of navigation and free fishing and fowling,

and of *passing freely over and through the water without any use of the land underneath,* wherever the tide ebbs and flows." *Id.* (emphasis added).

[¶ 74] Butler thus distinguished bathing from swimming. *See also Bell II,* 557 A.2d at 174–76, 177 (addressing "bathing," not "swimming"). Bathing, as it was "commonly understood," was not included in the right of navigation, and therefore it was not within the public's right to use intertidal lands. *Butler,* 80 N.E. at 689; *see also Michaelson,* 173 N.E.2d at 278 (applying the holding in *Butler* without discussion).

[¶ 75] By the functional definition relied on in *Butler,* scuba diving is not bathing because it primarily involves "passing freely over and through the water without any use of the land underneath." *See Butler,* 80 N.E. at 689. As a matter of function, scuba diving has qualities of navigation because it is only possible with the use of external apparatus such as breathing gas cylinders, breathing regulators, swim fins, weight belts, and buoyancy compensators. This equipment enables scuba divers to travel and remain submerged in the water for extended periods. *See NOAA Diving Manual: Diving for Science and Technology* 5–8 to 5–12, 5–26 to 5–30 (James T. Joiner, ed. 4th ed.2001).[18] In particular, dive weights and buoyancy compensators enable scuba divers to achieve neutral buoyancy, facilitating travel over extended distances through the water without touching the bottom. *Id.* at 5–26, 5–29. Other aspects of scuba diving further equate it with navigation and distinguish it from bathing. Most notably, scuba diving involves the use of underwater navigational aides such as watches, depth gauges,[19] and compasses. *Id.* at 5–42 to 5–44.

[¶ 76] Modern scuba diving did not exist when *Butler* was decided in 1907, or when we last interpreted "navigation" in *Andrews* in 1925. Certainly, it did not exist at the time of the Colonial Ordinance. It is of little moment whether the colonists could have foreseen that there would come a day when it was possible for persons to "pass[ ] freely over and through the water without any use of the land underneath" without the use of a boat or vessel. *See Butler,* 80 N.E. at 689. What matters is that the public's right of navigation includes that usage—passing freely over and through the water—and our common law enables us to recognize newly developed methods of travel associated with such usage. By this approach, we have previously concluded that the public's right of navigation includes the right to travel by skate across intertidal lands covered with ice, *see Marshall,* 93 Me. at 536, 45 A. at 498, and by horse over navigable rivers when frozen, *French,* 18 Me. at 434. Neither of these modes of travel involves a boat or a vessel.

---

**18.** The National Oceanic and Atmospheric Administration is a civil federal agency that employs many divers; although the *NOAA Diving Manual* is directed toward NOAA, it provides general guidance for a broad range of dive situations, including recreational diving. D. James Baker, *Foreword* to *NOAA Diving Manual: Diving for Science and Technology* vii (James T. Joiner, ed. 4th ed.2001). The website of the Professional Association of Diving Instructors provides a list of basic scuba equipment that is comparable to that of the *NOAA Diving Manual. See Introduction to Scuba Equipment,* padi.com, http://www.padi.com/scuba/scuba-gear/intro-to-scuba-dive-equipment/default.aspx (last visited August 22, 2011).

**19.** Some divers have replaced watches, depth gauges, and decompression tables with dive computers. *NOAA Diving Manual* at 5–42. Dive computers are electronic devices that monitor a diver's depth and time underwater to calculate decompression obligations. *Id.*

[¶ 77] For the common law to have the "expansive and adaptive force" described so many years ago in *Woodman,* 79 Me. at 458, 10 A. at 322, it must account for the technological advances that continually transform the means by which people navigate over and through water. Accordingly, we may apply a "sympathetically generous" interpretation to this area of the common law and include scuba diving as an activity that is within the public's right to use intertidal land for purposes of navigation. Furthermore, we have previously recognized that the public has the right to walk upon intertidal land when it is incidental to the right of navigation, *see Andrews,* 124 Me. at 363–64, 129 A. at 299; *Wilson,* 42 Me. at 24; therefore, walking across intertidal lands to access the ocean in order to scuba dive is also within the public's right.

E. Conclusion

[¶ 78] Because this case implicates long-established property rights, we should remain true to the common law and apply it so as to account for "the ever varying circumstances of new cases presented and . . . the newly developed industries of the age [while not] setting aside its plain doctrines because they are not in accord with our own views of what it should be." *Barrows,* 73 Me. at 449–50. The right to fish, fowl, and navigate has been the touchstone for determining the scope of the public's common law rights in intertidal lands, and, absent a compelling reason, it should remain so. For these reasons, I do not join the separate opinion of my colleagues in concurrence, but I agree that the judgment of the Superior Court should be affirmed.

The entry is:

Judgment affirmed.